The final case on our calendar for argument today is EDF Renewable Development versus Suffolk County. May it please the court. My name is John Petrowski and I'm an assistant county attorney representing the county of Suffolk in this appeal. The most important issue that the county would like to impress upon this honorable court is that the district court's factual findings that established a breach of contract were clearly erroneous and there was no breach of contract. May I ask you just a background question to help me put it into context? Six of the seven carports were built and put into operation? That's correct. And they still are in operation as far as you know. I mean, as far as you know, you don't. Yes, that's absolutely true. I know, okay. And there's this issue about obtaining a special condition building permit that allowed EDF to provide the so-called construction phasing after they got the building permit instead of before. And there's testimony from DPW and the assistant county executive that they would have issued a conditional building permit. The real issue here was they failed to get an alternative parking situation. I understand that, that's why I'm trying to- Yeah. My under- We would have done a conditional building permit. We had one issued. But- Well, that's what I'm asking. Of the seven, have I described more than one, I guess? Right, there were seven locations. And six of them were, the other six were sort of in the same mode. Sort of. Ron Cockham is a bit of a different animal, though. I understand. It was the last one, it was the biggest one, it was the third of the megawatts. And it's also one of the busiest, if not the busiest, train station on Long Island. It's a major commuter hub, it's at 120% over capacity. I don't know if you've ever parked there, but they're parking on the streets, they're parking on fire lanes, they're parking on the lawn. So it was very important that they establish a 500 to 550 space alternative lot. So the cars that were being displaced during construction, where the carports were going, would have some place to park. So it was during construction, and after the carports were completed, they could move the parking back? Exactly. We needed a place to put the cars, and they were going to do it in swaths of about 500. So that 500 spots of the lot would be closed down and cordoned off, and then they would park in the alternative lot. It would be useful if you could identify the particular factual findings of the district court that you were saying are clearly erroneous. I appreciate that. First, I'd like to just address the three elements of a breach of contract claim where the district court was clearly erroneous. First, the county did not breach the duty to cooperate by refusing to issue a conditional building permit. The duty to cooperate of the lease set forth in section 3502 could not be reasonably interpreted to mean that a municipal party to a contract would have to donate land, amend a lease, issue a building permit to somebody who's not entitled to it. Again, in fact- The district court offered another understanding about why the duty to cooperate was breached in its view. I don't think it was taking the position that the county had under all circumstances an obligation to issue a permit, but it noticed a course of dealing that changed markedly at one point. Is that wrong? No, that's not right. Moncalcan was a different animal, and there was a new administration that came in. The course of dealing on the other six doesn't affect the seventh, is that what you're saying? It does. It does. Can I just get back to Judge Carney's question? And that is, one of the findings was basically that when the new county executive came in, Ballone, he changed course and shut down the project to SBA 20 district magistrate judges. That's not entirely accurate, your honor. What happened under the previous administration, county executive Steve Levy was very enthusiastic about this project. And he essentially told DPW to get it done. And they did. They cooperated. They issued conditional building permits, which they do not normally do. And they regretted doing it because EDF had problems with meeting all the special conditions that were in these building permits. But they did it because on those smaller lots, the county had greater control. They were at county buildings where county employees worked. They were at smaller train stations. They were more comfortable doing it to get this done for county executive Steve Levy. However, when county executive Steve Ballone came in, well, let me backtrack a little bit. It was always EDF's obligation to provide alternative parking. It's in the lease. It's section 7.3 of the lease, where EDF had to provide a construction schedule and alternative parking for each location. There's testimony from Gerard Nolan, the project manager from EDF, that prior to breaking ground, he knew Ronkonkoma was going to be difficult because it was oversubscribed. It was about 130% of capacity. And he testified that he did a lot of research. He looked into things like running a shuttle bus from MacArthur Airport or purchasing land from the town of Brookhaven, or leasing land from the town of Brookhaven. None of that panned out. They were to halt. They couldn't get this done. I thought, wasn't there a nearby lot that seemed, at least at first, to be available for this temporary additional parking? I'm sorry, I didn't get it. Was there not a nearby lot that was initially thought to be available? Yes, there was. And ultimately, it didn't work out. So what the county did- Didn't work out because of what? Because the county didn't make it work out, or? Oh, you're talking about the county land? I'm talking about the additional land. I think it went to another project. I'm sorry, I thought you were talking about a lot that they were looking at from the town of Brookhaven. No, no. Yes, after all the other options, after they weren't able to meet their obligations under the contract, the county came up with a plan to donate land to them and enter into a lease amendment. The duty to cooperate doesn't require the county to do that, but under Steve Levy, we tried. We tried to get it done. Now when County Executive Steve Ballone took office, he was not so enthusiastic about the solar project as was Steve Levy. Steve Levy wanted the Suffolk County to be the solar county. It was more than enthusiasm, right? Broughton, the Director of Energy, I think, for the county. She testified that she was informed by the new county executive that the project was not going forward. Didn't she say that? Well, at that point, he didn't even know that there was a lease. What happened at that point- There was a contract. No, there are provisions in the contract that EDF was required to comply with for the contract to be enforceable. And they failed to get alternative parking for Ronkonkoma. When County Executive Steve Ballone took office, he did not want to go forward with Ronkonkoma. And he asked EDF to pursue alternative sites. There was no repudiation, there was no refusal to let them mobilize, there was no breach. He simply said- Alternate sites, you mean other than Ronkonkoma? Other than Ronkonkoma, because he felt that the solar carports at the Ronkonkoma train station were inconsistent with the Ronkonkoma hub development that was going on the north side of the tracks. And also, the lot that we were going to be donating was going to be used, at the time it was being planned on being used for the sewage treatment facility at the Ronkonkoma hub. So- Let me just point out, your time has expired. You might want to take another minute or two to just focus on what you'd like us to focus on. Okay, thank you. Yes, okay, so the factual, and I'll give a minute of my rebuttal if necessary. So we do not believe that the, we believe that district court was clearly erroneous in finding that the county breached the lease. Because the duty to cooperate did not rise to the level of donating land or issuing a building permit that they weren't entitled to, and they weren't entitled to the building permit. Because they didn't have an alternative parking lot developed, other than having the county donate the land. The duty to cooperate, similar to the covenant of good faith and fair dealing, can only impose an obligation consistent with the other mutually agreed to terms of the contract. It does not add to the contract a substantive provision that was not intended by the parties. Why don't you save the rest then for rebuttal and we'll hear from the county. And we'll hear from EDF, sorry. Okay. May it please the court, Harris Kogan of Blank Rome. I'd like to introduce my colleague, Ritter O'Lobbery. The 47 page findings of fact and conclusions of law went into great detail about the stalling tactics that the county engaged in, about the facts and documents to support that once County Executive Ballone met with Tritec, a real estate developer, he made a decision that Ronkonkoma would not go forward. Now I'd like to address two misconceptions, I believe, that have been made. Number one, Ronkonkoma was not the last project. The last project, actually, was Deer Park. Deer Park was also a Long Island railroad station, also oversubscribed, same type of issue as Ronkonkoma, and that occurred after the issues with respect to Ronkonkoma had already arisen. A permit with special conditions was given, adjacent site was used, and everything went smoothly. Now this statement that there was no agreement as to an adjacent parking lot is simply incorrect. What the testimony showed and what the district magistrate judge found was that, in fact, EDF was prepared to go forward and do whatever was necessary to accomplish alternative parking, valet, airport near there, a mall which they could use, but the county proposed, and we agreed, for a very good solution. There was an adjacent lot, we were going to develop that lot, we were going to improve the lot so it could be used for parking. And in fact, an agreement was reached. The county actually went and advocated at environmental review hearings for approval of that situation, and a lease was drafted and ready for signature by both parties. But once county executive made the decision that under no circumstances, despite knowledge of the lease, would he approve of Ronkonkoma going forward? Because he wanted to reserve the land instead for a local real estate developer. Once that decision- What was the hub project? I see it referred to a hub. What it was, as I understand it, was on the other side of the tracks, there was a proposal for commercial hub development, like stores and so forth along the Long Island Railroad. Station, there would be restaurants, stores, and the like. And this particular real estate developer apparently said, look, I might want to develop the other side as well. I don't know, I can tell you, my understanding is nothing has been developed at this point. But once that meeting took place, what the district court found was that there was a policy to stall. And you will see emails referred to in the decision in which people said, I have no stalling tactics left. They canceled meetings, they didn't return phone calls. And with respect to the so-called safety concerns, they were never once communicated. With respect to the adjacent parking lot that we no longer want to give it to you, that was never communicated. A complete failure of the duty of cooperation set forth in section 35 of the lease. And that is what magistrate judge found. Does EDF's view of the duty to cooperate entail a requirement on the county to donate land? No, it did not. But it did require that if you have reached an agreement where you have agreed to that and have received the lease which was negotiated between council, you have at least a duty to say, we've changed our mind. Please, EDF, you know you talked about the airport land? Go ahead and use that. We no longer want to do that. Instead, there was radio silence. There are emails from the internal emails at the county saying, what do we do? We have the lease, what do we do? And the answer was stall. The answer was, no communication shall come from the Department of Public Works. It has to come through the county attorney. You will see that in fact, there was a permit ready for signature signed by the deputy county architect, Llewellyn Johnson, in which the Ronkakuma permit with special conditions with the adjacent lot was prepared and signed by him. It didn't issue. Why not? Because of the factual finding made by the district judge that in fact, under no circumstances whatsoever, would he permit Ronkakuma to go forward. So in terms of the decision by the court, that there has been a breach of the duty of cooperation that is so fully supported by the record. That to say that that is clearly erroneous, I think, stretches any concept of trying to look at the facts. Now, there are other issues with respect to, that they've raised with respect to notice, with respect to Article 78, all of which I think we've addressed in our briefs. But I do believe that the evidence at trial fully supported everything that the district court concluded. I mean, if you read some of the findings, beginning in January of 2012, the county entered into a program of intentionally stalling the Ronkakuma project and failing to communicate with EDF, that was the finding of fact by the court. The court, as I said, looked to emails, such as one from Chief Deputy DPW Commissioner, in which he said, EDF has been calling constantly and, quote, I don't have any more delay tactics left to use. She found that no county representative ever told EDF that it could not use the adjacent parcel for alternative parking during the Ronkakuma project. She found that no county employee engaged in any meaningful collaborative process with respect to any concerns as to the phasing of Ronkakuma. And she concluded that the court further found finds that the issues that the county now tried to raise were as part of the county's overall stalling tactic to avoid issuance of a building permit for the installation of carports. The court rejects as not credible testimony that the decision not to grant a building permit to begin construction at Ronkakuma was based upon any failure of EDF to provide alternative parking or a phasing plan. Instead, that decision was based completely upon the Boulogne's administration decision not to go forward with the Ronkakuma project. These are not clearly erroneous findings. And at trial, we supported every aspect of our case. We supported liability. We supported every penny of our damages. They tried to argue that we shouldn't have ordered the solar panels in advance. The court rejected that argument as not credible. Finding that entering into what's called the master or a frame agreement was entirely appropriate. They tried to say that we shouldn't be entitled to damages because we could have sold off all of the solar panels. On day one at the original purchase price, the court found that simply was not credible. And in fact, over time, we did sell off 95% of the solar panels which we had purchased. EDF acted entirely proper throughout this proceeding. And this is not a situation where the county can now say, after the fact, guess what, you didn't get a parking, you didn't give phasing. Had they simply said to us, this is what you need, it would have been accomplished as it was before and as it was after at Deer Park. But the fact that they did not even communicate any concern whatsoever, despite pleas by EDF throughout the process, despite letters from council throughout the process, is an indication and a complete support for the district court's finding. That the decision to not go forward at Ronkakuma was a final and immutable decision made by County Executive Blum. If the court has any further questions, I'm prepared to address them. Thank you. Mr. Petrofsky, you have two minutes to rebuttal. I'd just like to address one aspect of the whole issue that's being made of stalling. In reality, we're talking about when Dennis Cohen, the county executive, I'm sorry, county attorney at the time, learned that there was a contract. After he said Ronkakuma's not going forward because Mark Lesko, the Brookhaven superintendent in TriTech had said we're building this big hub on the north side of the tracks. And County Executive Blum is very into economic development. He made a policy decision. I would prefer to move it to another location. He didn't say you can't build it in Ronkakuma. He asked them to explore alternative sites. He did decide he wasn't signing that lease agreement, which is perfectly within his right. The lease amendment was being negotiated to give them the land. The lease amendment was being negotiated under the Levy Administration. It got the DPW's commission approval, it got CEQ's approval. But it is an un-executed, un-effective lease agreement that does not bind a subsequent county executive. He made a policy decision that he didn't want to encumber that land that was going to be used for the sewer. And he decided not to sign that agreement and give them the alternative parking. And guess what then happens? Then the obligation goes back to where it belonged for EDF to get alternative parking. At that point, it was up to them to go and do the shuttle at MacArthur, or buy land from Brookhaven, or get it done, no matter what the cost was. Because that's what was driving the decision not to do all those other things. It wasn't that the county came up with a great idea, it was that they were at a dead halt on getting alternative parking. So the county came up with this plan, and then the new county executive said, I don't want to encumber that property. I want them to look at alternative sites. If they can get land somewhere else, let them get land somewhere else, all right? But when he said Ron Conklin was not going forward, that's what he meant. And then he found out about the lease. This whole stalling thing, he learned about the lease on January 24th. And on February 10th, 16 days later, he spoke to George Nolan and said, we prefer you to go to alternative sites. Now, these are sophisticated business people. They have competent counsel. If they're saying the county executive wants you to build alternative sites, I think it's a pretty safe bet to say that we're not signing your lease agreement. And they never asked for a follow up on it. They completely abandoned following up for the lease amendment on that land. Thank you, your time has expired. We appreciate your argument. We'll take the matter under advisement. Thank you both. That concludes our oral argument calendar today. We have two matters under submission, United States versus Trapp-Diaz and Abraham versus Stewart. We'll take those under advisement as well. The clerk will adjourn court.